JEFFREY L. CLEMENS
Reg. No. 43400-060
FCI Gilmer
P.O. Box 6000
Glenville, WV  26351
Tel: 419-433-4438

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JEFFREY L. CLEMENS, | ) | No. |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES MARSHALS | ) | |
| SERVICE, MVM, INC., JOHN | ) | |
| DOE NO.1, JOHN DOE NO.2, | ) | |
| and JANE DOE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## Parties

1.   Plaintiff Jeffrey L. Clemens is a freelance writer, activist
and litigant.  He is a citizen and resident of the State of Ohio.
His permanent address is:  412 Dockway Drive, Huron, Ohio 44839;

2.   Defendant United States Marshals Service, an agency of the
United States government, is headquartered at:  2604 Jefferson
Davis Highway, Alexandria, Virginia 22301;

3.   Defendant MVM, Inc., by which John Doe Nos. 1-2 and Jane Doe
are believed to be associated (but whose addresses are unknown),
is a private security service firm operating out of Vienna, Virginia
and at:  44620 Guilford Drive, #150, Ashburn, Virginia 20147.

## Jurisdiction

This court has original jurisdiction pursuant to 28 U.S.C. § 2675 and 28 U.S.C. § 1346, and, to an extent, §§ 1331 and 1332.

## Summary

This action brings forth claims of negligence, intentional infliction of emotional distress, excessive force and other wrongful conduct involving a "confrontation" between the plaintiff and U.S. Marshals Service designees on January 13, 2012 at the U.S. District Courthouse, Boston, Massachusetts, the result of which plaintiff received significant, notable and verifiable multiple injuries, as herein alleged.

## Allegations

1.  That on January 13, 2012, in the courtroom of the Honorable Douglas P. Woodlock ("Woodlock") at the U.S. District Courthouse, Boston, Massachusetts, at and within a sentencing hearing in Case No. 10-CR-10124-DPW, Plaintiff Clemens ("Clemens") personally addressed the court, in greater part as a rebuttal to AUSA David G. Tobin and Attorney Stephen C. Pfaff, for over 30 minutes, doing so calmly and politely, without incident, eventually yielding the microphone to Woodlock;

2.      That Clemens's concluding remark to Woodlock
        was:  "[W]e've got a problem here.  Frankly,
        I don't think we have a valid verdict,"[1] itself
        an implied reference to prior written and
        submitted pleadings, some of which were filed
        earlier on the 13th (and discussed, in part,
        with the court) as well as on the day prior;

3.      That Woodlock responded by saying, "Well, that's
        a separate issue question as you know";

4.      That Clemens, lastly, in turn, responded, "Okay.
        I tell you what, with all due respect (emphasis
        added) I'll leave it at that, Your Honor";

5.      That Woodlock went on to say, at one point, "I
        have read all the materials that Mr. Clemens has
        submitted...";

6.      That Woodlock went on further to say a number
        of things (a matter of record) and at one point
        Clemens stood up and said, "You know, your Honor
        -- Let's just call this off," an obvious request
        for a continuance (a common court occurrence);

7.      That, though Clemens remained at his designated
        position behind the microphone, and while Woodlock

[1] The underlying trial proceedings and May 2011 verdict for which
CLemens was being sentenced are currently on appeal to the First
Circuit Court of Appeals, Case No. 12-1149.

- 3 -

7.   (continued) remained entirely silent, not
     offering a single (audible) comment or direction,
     three (3) plainclothed persons -- John Doe No.1,
     John Doe No.2, and Jane Doe -- arose without
     urgency from their nearby seats and sauntered
     over to Clemens while he, again, stood calmly;

8.   That, from this point, events on January 13,
     2012 unfolded as recounted in the attached
     "Complainant's Version of Events" [Attachment A]
     offered, for benefit of the court and parties,
     as the precise allegations as was submitted to
     the U.S. Marshals Service in an Administrative
     Claim filed with the agency in May 2013, denial
     of which precipitated this action;

9.   That the above-referred Administrative Claim was
     denied on June 18, 2013;

10.  That numerous Freedom of Information Act requests
     were filed by Clemens and his representatives from
     March 2012 to October 2013 resulting in videotapes
     and numerous (redacted) official reports, ones that
     err greatly in their accuracy and presentment of facts;

11.  That Attachment A should be considered the central
     part of this complaint's stated Allegations.

- 4 -

## Cause of Action

1.  The acts and omissions on the part of Defendant United States Marshals Service constitute negligence, excessive force, and intentional infliction of emotional distress as well as a violation of the plaintiff's due process and fair trial rights:

2.  The acts and omissions on the part of MVM, Inc. constitute negligence as well as a violation of the plaintiff's due process and fair trial rights;

3.  The acts and omissions on the part of Defendant John Doe No.1, John Doe No.2 and Jane Doe constitute negligence, excessive force, and intentional infliction of emotional distress as well as a violation of the plaintiff's due process and fair trial rights.

## Relief Sought

The plaintiff prays for relief in the amount of $22,500 compensatory (physical damages), $200,000 compensatory (emotional damages), and $400,000 punitive (non-government parties), and other relief as deemed fair, necessary and appropriate.

Respectfully submitted,

*Jeffrey L. Clemens*

Jeffrey L. Clemens        Dated this 18th day of November 2013

- 5 -

I.   **ADMINISTRATIVE CLAIM** - COMPLAINANT'S VERSION OF EVENTS

The following events occurred at approximately 11:30 a.m. on January 13, 2012 in and around the courtroom of Judge Douglas Woodlock at the U.S. District Courthouse, Boston, Massachusetts during a scheduled (previously postponed) sentencing hearing in Case No. 10-CR-10124:

(1)   That after personally addressing the court for some many minutes,as Clemens had done on many prior occasions, and, among other things, discussing an arguably significant trial error (previously briefed), Clemens yielded the microphone to Judge Woodlock by first calmly saying, "(W)e've got a problem here.  Frankly, I don't think that we have a valid verdict." (Court interjects) "Well, that's a separate issue question as you know." (Lastly) "Okay.  I tell you what, with all due respect (emphasis added) I'll leave it at that, your Honor." (See Attached Transcript Excerpt, SD 2, Page 45, Lines 6-11);

(2)   That the court (Judge Woodlock) went on to say, at one point, "I have read all the materials that Mr. Clemens has submitted..." Id. Page 45, Lines 20-21;

(3)   That if so (the court's statement above is true) then the court, at that point, had read in prior briefing or was otherwise aware that the alleged "threat victim", Attorney Stephen Pfaff, who himself spoke at length earlier in the hearing, had, until recently, represented eleven (11) Boston area FBI agents in civil litigation rooted in the FBI SA John Connolly, Jr. - "Whitey" Bolger matter;[1]

---

[1] In court filings that very day and the day prior, Clemens put forth facts and arguments for a fundamental conflict of interest involving "victim" Pfaff and the prosecution, and a probable influence on defense counsel, Ian Gold, listing the eleven agents by name, three of whom were represented simultaneously by Pfaff and attorney Eric P. Christofferson, even as the Clemens prosecution commenced.  Christofferson became an AUSA, it appears, in mid-2010 following Clemens's indictment (April 2010), later appearing and assisting AUSA David Tobin in prosecuting Clemens.  Tobin, who sought the indictment of Clemens, is a (former) Suffolk Law School classmate of Pfaff as well as Neil Connolly, cousin to a John J. Connolly, Jr., possibly (former) FBI SA Connolly, so referred.

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

    (4)   That neither the court nor prosecution ever,
in the course of the Clemens prosecution,
identified (much less told the jury of) any
specific or particular statement or expression,
by Clemens, that was deemed (supposedly) a
threat to include, especially, at sentencing,
a tragic flaw in the proceedings (Clemens
wrote a 12-paragraph email containing nearly
50 sentences; as for what sentence (supposedly)
contained a threat is a serious question that
has gone unanswered to-date);

    (5)   That at one further point in his prosecution
Judge Woodlock alluded to that which was
(supposedly) "not a manner or figure of speech"
-- to wit, the (supposed) ·threat at issue,
again, not identified or specified -- "what
anyone would have understood to be disquieting
effects"; however, any magazine article, say,
in Time or Newsweek, has potential so be so-
called "disquieting"; the relevant issue here
is Freedom of Speech; in any case, the quality
of being "disquieting" does not match or meet
any element of the offense for which Clemens
was charged and tried);

    (6)   That at same said point Judge Woodlock further
proclaims erroneously -- With no statement or
expression ever specifically identified, how can
any proclamation, conclusion or assessment be
fairly made? It cannot -- "That is to say that
Mr. Clemens can't control himself"; (See Attached
Transcript Excerpt, Page 48, Lines 4-6, 7-8)

    (7)   That, concerned by Woodlock's remarks (surely,
an ominous indication of an intent to thus impose
"an aprropriate sentence"), and having received
virtually no legal assistance (questionable at best)
during the course of his sentencing, and wishing
to show the court some documents he had before
him, Clemens interjected (as Woodlock had done
at least twice previously), "You know, your
Honor -- (Clemens stood up after thoughtfully
backing away his chair) -- Let's just call this
off (essentially, a request for a continuance
of the proceedings)..." Id. Page 48, Lines 9-12

(continued) Clemens, in December 2010, prior to his sentencing
and in possible support of a "victim conduct" sentence reduction,
asked counsel Gold, by letter, to verify (or rule out), with aid
of investigative resources at his disposal, the Connolly link.

ATTACHMENT A

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

    (8)   That, at this point, after Clemens stood up and
merely stood, remaining in one spot before the
microphone, there was a fairly long pause (15-20
seconds) and relative -- almost awkward -- silence
when neither the court nor Clemens (nor marshals)
said anything;

    (9)   That Judge Woodlock's court reporter, Helana Kline,
did not indicate this pause on the official record
(Id. Page 48, Lines 12-13) although both audio and
video recordings would surely substantiate said
pause, an extremely important one considering what
followed (as now recounted);

  (10)   That at some point during the pause three marshals
stood up out of their seats and walked, almost
sauntering (but surely not rushing), over to Clemens,
as he stood, and themselves stood for some mements,
again, there being no dialog of any kind; some
moments later, without any instruction from the
court or any dialog whatsoever (marshals never
asked the court what to do), and even though Clemens
was simply standing still (except for occasionally
looking behind him at the marshals), one of the
marshals grabbed Clemens's arm and handcuffed him;

  (11)   That even though Clemens was merely standing still
(motionless and speechless), in handcuffs, not saying
or doing anything, still, no one said anything,
particularly and especially the court yet, after
some moments, without themselves saying anything,
giving no instructions, seeking no instructions
from the court, asking Clemens nothing, giving no
warning, the marshals suddenly (violently) rustled
Clemens away by (a) tilting him backwards, and
dragging him by the heels (on of his shoes, in fact,
eventually fell off) over to beside the witness
stand (coincidentally, out of view to the court);

---

(continued) Gold took no apparent action.  This Connolly/FBI
matter implies an extraordinarily close and peculiar relationship
between Pfaff and the FBI, one of whose agents (Boisselle), with
Tobin, sought and obtained a Clemens indictment.  All three --
Pfaff, Tobin and Christofferson -- were present on the 13th.
Clemens's concerns about a USAO and Christofferson influence
on Gold are valid.  Ian's cousin, Adam Gold, with whom Ian lived
while attending NYU Law together, practised law at Ropes & Gray
(Boston office) with Eric Christofferson who was (then) a private
attorney (See Part 3 for further facts related to this issue).

ATTACHMENT A

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

   (12) That only after he was being rustled away
        (about 20-30 seconds after standing up) did
        Clemens speak anything other than "Let's
        call this off" and that was, while being
        dragged backwards and having noticed a
        nearby Pfaff observing the marshals' actions,
        "I mean, really, come on.  Mr. Pfaff wanted
        that.  He wanted that email.  I thought
        the FBI would come to my rescue, and they
        didn't.  He wanted that."

   (13) That at no time did Clemens holler, scream
        or shout -- talk any louder than "normal" --
        prior to the marshals assailing him, even then,
        only when he winced from the extreme pain
        imposed upon him by the marshals;

   (14) That at no time after standing up, nor before,
        did Clemens use any profanity or make threats
        or undue insistences, or lunge at anyone, or
        even hint at intending to do so; Clemens at all
        times, up until the marshals started rough-
        housing him, stood in one location, the few
        square feet otherwise designated to him by
        sake of being a person in attendence of the
        proceedings (surveillance video will, of course,
        substantiate this); only after the marshals
        suddenly lurched Clemens backward did he say,
        "Goddamnit", out of shock, not contempt or anger
        or disrespect;

   (15) That after literally being dragged over to the
        witness stand area -- still without any word
        or direction from the court -- the marshals
        continued their -- What do you call it? --
        assault by throwing Clemens down on the floor,
        pressing the left side of his face down on the
        floor and applying extraordinary amounts
        of pressure on his handcuffed wrists thereby
        causing Clemens, at times, to shout out in pain
        and plea for them to stop, which they did not do;

   (16) That at several times the pressure and pain was
        so intense that Clemens said to his assailant
        (the man immediately behind him), "Ease up, will
        ya? I'm not moving!" after which the marshal
        replied into Clemens's ear, "Oh, yeah?" and
        proceeded to press even harder causing Clemens,
        of course, to shout out in pain, as was obviously
        the intent behind suddenly increasing pressure
        as, again, Clemens was not moving or resisting
        in any fashion;

                              4                    ATTACHMENT A

I.    COMPLAINANT'S VERSION OF EVENTS - Continued

    (17) That even after "whatever situation there was"
         (again, Clemens had merely stood up and asked
         for a continuance) having been, by considerable
         force, "stabilized" (to borrow from police
         parlance) -- Would not the marshals simply
         surrounding Clemens as he stood have been
         sufficient enough "action"? -- still, the
         court, surely knowing it was witnessing some-
         thing hurtful and extremely mischievous, said
         or did nothing;

    (18) That Clemens, at numerous times, in earshot
         of others, told the man on his back, "Hey, let
         up... Ease up, will ya... I'm not moving!" yet
         still, without any word from the court as to
         what to do further, the marshals stood Clemens
         up and "push-dragged" him feet first toward
         a door leading out of the courtroom, actually
         forcing Clemens to walk with an extremely awkward
         and backward tilt, thereby making it appear he
         was "fighting back" and "resisting" as he was
         hauled, without explanation, on out of the court-
         room, again, without any discernible word or
         direction whatsoever from the court;

    (19) That in the hallway outside of Judge Woodlock's
         courtroom, the marshals "ordered" Clemens to face
         the wall (he did) and some moments later told
         Clemens to get down on his knees, which he was
         in the process of doing (handcuffs make it some-
         what difficult to do) when a woman's arm grabbed
         Clemens's left leg and pulled it from under him
         thereby causing Clemens to fall to the floor --
         directly onto his left knee -- and shout in pain;

    (20) That after crashing to the floor, the marshals
         again "ganged up" and pressed Clemens forcedly
         against the floor and again, by applying extreme
         pressure on his as yet handcuffed wrists, made
         him reel and writher in pain;

    (21) That at one point while on the floor in the hallway
         one of the marshals (a female, it appeared), with-
         out warning, slammed Clemens's head against the floor
         with significant force  (a large bump later formed);

    (22) That again, like in the courtroom, the marshals
         kept pressing the handcuffs against Clemens's
         wrists, making him repeatedly shout out in pain
         despite Clemens's pleas which, at one point, was
         clear and very specific: "My left hand has issues.
         Will you ease up? I'm not moving!" but the marshal

                              5                    ATTACHMENT A

I.    COMPLAINANT'S VERSION OF EVENTS – Continued

> (22) (continued) again said into Clemens's ear,
>      "Oh, yeah?" and again pressed down, making
>      Clemens <u>again</u> scream out in pain;
>
> (23) That at one point in the "melee", for lack
>      of any better term (unless we call it "assault"
>      as surely Clemens was not fighting nor
>      struggling but simply reacting to what was
>      happening, whatever <u>that</u> was), one of the
>      (male) marshals uttered, as if just to him-
>      self yet clearly audible to the others, "Uh,
>      huh... George <u>W.</u> Bush... yeah, right";
>
> (24) That as well, at one point, a (male) marshal
>      said fairly loudly, "Get the wheelchair"; a
>      woman's voice responded and some moments later
>      Clemens was, for some reason (maybe it was his
>      injuries), stood up and placed into the chair
>      followed thereafter by a marshal tossing one
>      of Clemens's shoes onto his lap (apparently,
>      the one that fell off while dragging him);
>
> (25) That while seated and rolling away (in the
>      wheelchair) Clemens observed two (2) sparate
>      <u>surveillance</u> <u>cameras</u> pointing in opposite
>      directions from above but nonetheless directly
>      upon the area where Clemens went down on the
>      floor;
>
> (26) That Clemens was, without explanation or any
>      direct words from any marshal whatsoever, taken
>      (by chair) to a holding cell where he remained
>      for some hours (without, by the way, anyone
>      asking of his injuries or state of being);
>
> (27) That in the hours that Clemens remained in a
>      holding cell -- again, without explanation --
>      numerous pains and injuries started manifesting
>      themselves; a large bump formed on the left side
>      of his head; both his wrists, and especially
>      his right wrist, swelled up considerably, in all
>      their black, blue and yellow glory; the area
>      beneath his left knee became increasingly raw
>      and tender; dizziness set in, and general malaise;
>      blood was noted on Clemens's left pant leg near
>      his knee; there were scrapes on his face and arms,
>      and bruises to boot;
>
> (28) That the above-referred injuries were later
>      viewed, photographed and treated by medical staff
>      at the Wyatt Detention Center in Central Falls,
>      Rhode Island;

                                   6                    ATTACHMENT A

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

(29) That while seated in the holding cell
     Clemens started experiencing shooting pain
     up his right leg, in addition to elevated
     pain in and around his left knee;

(30) That at no time did any marshal inquire
     of Clemens's injuries, which were surely
     visible and apparent;

(31) That some hours later (after being balled up,
     busted up, banged, bruised, bashed and bloodied)
     Clemens was taken back to Judge Woodlock's
     courtroom wherein a short hearing commenced
     opened by Woodlock insinuating that, by his
     observation, a so-called "outburst" occurred
     caused by Clemens (Clemens begs to differ;
     an "outburst" was created by the marshals
     going to town on Clemens at the time of near
     absolute silence in the courtroom and lack
     of any motion or commotion whatsoever; (See
     8-10 Above)

(32) That at said (second) hearing Clemens told
     the court that he had seen many people rise
     out of their seats to address the court (and,
     really, are not the ubiquitous "Objection,
     Your Honor!" a readily acceptable form of out-
     burst?) and further said he (Clemens) has had
     (up to the time) at least 15 prior appearances
     in court without incident and (implied) with-
     out any prior marshal involvement or inter-
     vention (verifiably true);

(33) That Clemens had, previously, in the course
     of his Boston prosecution, motioned for dis-
     missal on Free Speech grounds (and other bases)
     and, post-trial, motioned to vacate the jury
     verdict for cause (a tainted jury issue, for
     one), with subsequent numerous supplemental
     arguments filed as well; as such, the court
     (on the 13th) was much aware of issues with
     regards to the validity of the very verdict
     for which the court was intending (at the time)
     to impose a sentence; (See 1 Above)

(34) That the sentencing of Clemens was continued
     (at the time) to January 25, 2012; however, on
     the morning of January 18, 2012 Clemens was
     awoken (at Wyatt Detention Center, itself named
     for a former U.S. Marshal), transported to the
     Woodlock courtroom and, in a "surprise hearing",
     sentenced to 60 months incarceration, a shock

7                                    ATTACHMENT A

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

(34) (continued) given that, without enhancements,
Clemens was charged with but a Level 12 offense
having an original projected probable sentence
of 12-18 months, a fact which was presented
and discussed in court in April 2011;

(35) That Clemens objected to the surprise hearing
as he had mitigating documents he intended to
file and relevant paperwork in transit to him
from the discontinued hearing of the Friday
prior (the 13th) wherein defense counsel had
gathered and held the paperwork Clemens, at the
time, intended to present but for the marshals
incident (their disruption);[2]

(36) That at said surprise hearing Clemens had urged
the court to make inquiry into, especially, the
events occurring in the hallway the Friday prior
as Clemens indicated he felt that the proceedings
were possibly "jeopardized"; to wit, "victim"
Pfaff had, in 2010, in regards to a civil case
hearing (April 1, 2010), specifically requested
of FBI SA Rachel Boisselle "extra security" for
said hearing (Hollywood, by the way, Mr. Pfaff,
is on the West Coast), implying he may have done
so again albeit with inappropriate instructions
and ill motive;[3]

(37) That Clemens is currently appealing his jury
verdict and sentence to the First Circuit Court
of Appeals, Case No. 12-1149;

(38) That on or about January 16, 2012, Donald, Marilyn
and Jonathan Clemens (relatives), who were present
in the Woodlock courtroom on the 13th and thereby
"witnessed" the marshals incident, submitted three
(3) individual signed and sworn affidavits to the
Massachusetts Attorney Generals Office in Boston
in a complaint of "assault" lodged against those
(marshals) participating in the above-noted acts;

---

[2] When Clemens stood up, he set down a stack of papers on top
of which was a copy of a letter to Clemens from defense counsel
Ian Gold in April 2011 stating that his "guidelines range" was
"12-18 months". When the marshals took Clemens, Gold, for some
reason, took the stack which, for a number of reasons (noted
on the record in subsequent pleadings by Clemens), was not
available to Clemens until after his sentencing on the 18th
despite there having been an afternoon session on the 13th.

[3] The possibility of Pfaff, through a representative at the FBI
or USAO, having contacted the U.S. Marshals before the Clemens

ATTACHMENT A

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

(39) That Clemens, in or about April 2012, submitted
his own signed and sworn affidavit to MAGO/Boston
as both an original and supplement to the January
2012 affidavits (See 38 Above) (Mary A. Phillips,
ADA, appears to be involved); as well, in or about
December 2012 Clemens submitted a parallel and
related complaint (attaching all Clemens affidavits)
to the U.S. Attorney's Office/ Boston, specifically
addressed to U.S. Attorney Carmen Ortiz together
with an attached copy of a letter Clemens wrote to
Judge Woodlock (See 40 Below);

(40) That Clemens, in and about December 2012, wrote
to Judge Woodlock insisting that he assure the
preservation and release of both in-court and hall-
way surveillance video of the events of January 13,
2012 (See 39 Above);

(41) That from March 2012 to the present both Jonathan
Clemens and the Complainant (Jeffrey Clemens) sub-
mitted numerous Freedom of Information Act (FOIA)
requests to the USMS (Boston and Washington, D.C.)
for both official written reports as well as in-
court and hallway surveillance video, including a
direct request to "chief" marshall John C. Gibbons,
all of which were essentially denied initially
while presently some issues and matters remain open
and at the attention of the DOJ/OGC (Bordley et.al.);

(42) That in or about December 2012 Clemens recieved
copies of official marshals reports[4] and in-court
video (DVD) -- but no hallway video(s) (DVD) --
the reports containing numerous and substantial
falsehoods and inconsistencies as can be confirmed
or otherwise reconciled by reviewing the official
court reporter transcripts (some of which are
attached hereupon) and surveillance video including,
especially, that of the "withheld" hallway incident;

---

(continued) sentencing eharing is not at all an unlikely scenario.
David Tobin, AUSA who prosecuted Clemens (with AUSA Christofferson),
has a brother Ned Tobin who is Deputy Director of Security for the
Massachusetts Courts, an agency that deals daily with the USMS.
Clemens merely stands up and is assaulted twice, in front of a
federal judge (who said or did nothing when it was happening), a
judge who himself associates with the USMS on a daily basis? What
is wrong with this scenario? Plenty. (See Part 3)

[4] However, the preparers and, in turn, participating marshals were
not identified or disclosed (names were redacted), that is, except
for a certain Kevin Donahue.  The preceding October (2012) Clemens,

I.   COMPLAINANT'S VERSION OF EVENTS - Continued

      I declare under penalty of perjury that the foregoing
is true and correct.

Signed: _Jeffrey L. Clemens_
                    Jeffrey L. Clemens

Date: _4/30/13_

---

(continued) however, received a letter from the DOJ/OGC, in this
matter, that referred to three (3) individuals (Clemens refrains
from disclosing their names herein) and the January 13, 2012
courthouse incident.  All three, upon further investigation by
Clemens, were found to be from out of town, from places other
than Boston (New York, New Jersey, Chicago/South Michigan), a
curous and peculiar coincidence, frankly (two of them appear to
have criminal records), and warranting an explanation from the
DOJ/OGC if not further investigation (See Part 3).  Absent, or
in light of, such, Clemens reserves the right to amend this
complaint if, when and where appropriate.

ATTACHMENT A

1    the second litigation was declared at bench warrant so I

2    don't have to drive around wondering whether I'm gonna be

3    stopped, then taken into custody, take a month to be

4    transported to Hingham, and then possibly have some

5    spiteful sentence of a year on a baseless charge.

6        That's why I litigated.  That's why I turned to you,

7    folks, the feds.  What happened?  The latest info from

8    Clemens:  Oh, by the way, I contacted the FBI.  That's all

9    Mr. Pfaff said to this courthouse.  I won't name the

10   individual, and had the case thrown out.  That's amazing.

11   That impresses me.  That really does.  I don't think I

12   could ever do that.  Imagine that, but the subject got

13   appealed, and that's why I attached my opening brief that I

14   did recently is that the issue on that civil appeal was not

15   the contents of this e-mail which that jury last May got

16   every impression that it was.

17       Unfortunately, my counsel brought up the appeal.

18   Mr. Pfaff said it was upheld, and, unfortunately, there

19   was not further questioning to clear that up for whatever

20   reason.  And I won't speak to that right now, but that jury

21   felt the civil appeal of this submission to a certain

22   court, I was arguing process and there were still issues of

23   process.  That was, that was the appeal, adequate notice and

24   process, not content, not whether this was threatening or

25   not.  And my jury thought that, Jesus, you know, they heard

1    300 -- a panel of federal judges said:  This was threatening

2    so what are they gonna do, acquit me?  No way.  No way

3    that they were gonna acquit after hearing that appeal, that

4    civil appeal, on the issue of adequate notice.

5        They didn't know that it was not about the content of

6    that e-mail, so we've got a problem here.  Frankly, I don't

7    think we have a valid verdict.

8            THE COURT:  Well, that's a separate question as you

9    know.

10            THE DEFENDANT:  Okay.  I tell you what, with all due

11   respect, I'll leave it at that, your Honor.

12            THE COURT:  All right.  Thank you.  I have found

13   this a very challenging case on a variety of levels, and

14   I'll start with the principle factors under Section 3553

15   that I'm required to consider in evaluating the sentencing

16   guidelines, whether they can be treated as reasonable under

17   the circumstances or not.

18        And that has to do with the nature and the circumstances

19   of the defendant who I've listened to at length today and

20   I have read all of the materials that Mr. Clemens has

21   submitted.  I've actually read portions of them at certain

22   times, trying to get a sense of this, and I think I do

23   have a sense, but it's one that's been reflected by several

24   different vectors.

25        I have read carefully the letter from Mr. Clemens'

EXCERPT

ATTACHMENT A

SD 2                                                          48

```
1    that he is sometimes spontaneous because of his vocational
2    leanings and background.  I think that essentially
3    understates the matter.
4        This was not a manner or a figure of speech; it was
5    on reflection what anyone would have understood to be
6    disquieting effects.  The spontaneity aspect of it is more
7    important to me.  That is to say that Mr. Clemens can't
8    control himself.
9             THE DEFENDANT:  You know, your Honor --
10            THE COURT:  Mr. Clemens --
11            THE DEFENDANT:  -- let's just leave.  Let's call this
12   off, I mean....
13            THE COURT:  Mr. Clemens.
14            THE DEFENDANT:  I mean, really, come on.  Mr. Pfaff
15   wanted that.  He wanted that e-mail.  I thought the FBI
16   would come to my rescue, and they didn't.  He wanted that.
17            THE COURT:  Mr. Clemens now, just a moment.
18            THE DEFENDANT:  Ow, ow, goddamn it.
19            A SPECTATOR:  Ease up over there, will you?
20            U.S. MARSHAL:  Courtroom No. 1, need assistance in
21   Courtroom 1.
22            THE COURT:  I'm going to put the court in recess.
23   I'll ask that the marshals provide me with a report of
24   whether or not Mr. Clemens is in a position to continue
25   after the outburst that I observed here.
```

EXCERPT

ATTACHMENT A

1              MR. GOLD:  I may have been mistaken.

2         (Atty. Gold conferred with Mr. Clemens off the record)

3              MR. GOLD:  Friday, your Honor.  I apologize.

4              MR. CLEMENS:  To remind the Court, I yielded the

5    microphone, so to speak, to you, understanding that the hearing

6    was nearing an end, and so some things went unsaid, and I'd

7    wished to speak more, and I made that known visually.

8              THE COURT:  I will permit you five minutes to address

9    me now in court.  This is highly unusual.  It can address only

10   those things that were not available or known at the time of

11   the sentencing at the time of your original allocution.

12             But we are not going to continue to extend these

13   proceedings any further now, so if there is something that you

14   have to say, you have a period of time in which to do so.

15             MR. CLEMENS:  Well, your Honor, I think it's ironic

16   that it's not the 25th, like, I over the weekend, had expected.

17   I did not have any idea that Mr. Gold was putting in a

18   continuance that would sort of make this hearing happen today.

19   I, frankly, am just -- I was in the middle of work that I felt

20   would mitigate any adverse effects of the events of last

21   Friday.

22             THE COURT:  As I said, Mr. Clemens, you can address

23   that issue now orally.

24             MR. CLEMENS:  Well, you know, I was awoken this

25   morning, I grabbed this material, and I've been in a somewhat

                                                    ATTACHMENT A

8

1    noisy holding cell all morning.  I haven't collected thoughts

2    to really -- to address you today, sir.  I mean, I will do the

3    best I can, but I really am surprised of today's assembly.  I

4    really am.

5            THE COURT:  I have heard the explanation.  Now, if

6    there is something that you want to say that is substantive,

7    you may do so.  If you are not in a position to say it, then I

8    will move on.

9                            (Pause)

10           MR. CLEMENS:  Your Honor, I found it extraordinary

11   what happened not even just in the courtroom.  Actually, I will

12   give it that, but when I left the courtroom, and I really -- I

13   think it's -- I don't necessarily want to speak to the conduct

14   of the Marshals at this point; it's a little awkward.  I would

15   rather have it taken up in a way that it is not open like it

16   is.  I mean, I'm on the spot here.

17           But, frankly, I just couldn't believe what happened

18   after I went through that door, and I think until I have

19   reflection and have an understanding and maybe even ask the

20   Court whether it has any knowledge or understanding what

21   happened when I left this courtroom.

22           THE COURT:  Mr. Clemens, apparently there is a dispute

23   between you and the Marshals of something that occurred outside

24   of my presence.  It is not relevant to the question of

25   sentencing for acts that you engaged in that the jury found you

                                                    **ATTACHMENT A**

                                                        EXCERPT

1    guilty of. It may or may not lead to some other matter, but it
2    is not material to the sentencing that is going to take place
3    now.

4        MR. CLEMENS: Well, your Honor, to the extent that you
5    commented at the second assembly last Friday that sentencing
6    would reflect the events. I mean, there are some information
7    from the discovery record, for instance, I wanted to bring to
8    your attention. Mr. Tobin is already aware of this.

9        THE COURT: Did you have this material when you were
10   here last Friday?

11       MR. CLEMENS: This particular document I'm just
12   referring to now wasn't relevant until after the incident with
13   the Marshals, so I couldn't have imagined presenting it to this
14   Court until after that. It, frankly, is an e-mail request of
15   Mr. Pfaff to Agent Rachael (ph) for wanting her to alert the
16   U.S. Marshals Office and request extra security in the
17   courtroom of Judge Young at a civil hearing in April of 2010 at
18   the initial phase of this prosecution, and I feel -- I think it
19   should be asked whether such similar request was made for the
20   hearing last week when I was surprised to see Mr. Pfaff,
21   frankly. I thought he more or less waived a victim impact
22   statement. I take it as his right; I understand he had a right
23   to speak. But that seems to be his nature. I noticed that
24   through three years of litigation he --

25       THE COURT: I think you are speaking now to matters
                                              **ATTACHMENT A**

                                              EXCERPT

1   that you spoke to for, as I said, an hour on Friday; that is,

2   the culpability of the victim here for your crime.  We have

3   been over that now.  The role of the Marshals is to provide

4   security in the courtroom; that is their statutory obligation

5   in that connection.

6          To the degree that Mr. Pfaff may have asked for

7   Marshal presence in some other proceeding is a matter that may

8   reflect on the degree of his fear, but it is not going to play

9   into my sentencing evaluation.

10         So, are there other matters?

11         MR. CLEMENS:  Well, I hope that I am assured of, then,

12   if the Court wishes to proceed with sentencing -- and I must

13   say, no offense, I am opposed to proceeding today.  This came

14   as a surprise.  I can't articulate and simplify what I am

15   working on here, but I assure you it is from an existing record

16   that will not surprise the prosecution and it will perhaps gain

17   some understanding to events on Friday.

18         But back to Mr. Pfaff.  Frankly, I see it as, given

19   what happened behind that door, the possibility of some other

20   commentary having been expressed.  There's a possibility, and I

21   would like to explore that possibility.

22         THE COURT:  That is not relevant for purposes of this

23   sentencing.  Is there anything else that is relevant based upon

24   the events in the courtroom last Friday?

25         MR. CLEMENS:  I had a couple -- I had some statements
                                          ATTACHMENT A End